# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00088-CV

**Barbara J. Booker, Appellant**

**v.**

**City of Austin, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. D-1-GN-06-001757, HONORABLE GUS J. STRAUSS JR., JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After she was terminated midway through the probationary period that aspirants must successfully complete before they can become full-fledged City of Austin (City) firefighters, Barbara Jonell Booker sued the City under the Texas Commission on Human Rights Act (TCHRA), asserting theories of racial and gender discrimination and retaliation. The City moved for summary judgment, seeking dismissal of all of Booker's claims. The district court granted the motion in full and rendered judgment dismissing all of Booker's claims. Booker appeals, contending that the district court erred in granting summary judgment as to liability theories not addressed in the City's motion and that she presented summary-judgment evidence raising fact issues as to all theories that the City's motion did address. In addition to responding to Booker's issues, the City asserts that Booker failed to exhaust administrative remedies with respect to many of her claims and theories. We will affirm the district court's judgment.

## BACKGROUND

**AFD's hiring & training processes**

By all accounts, the job of a firefighter with the City of Austin's Fire Department (AFD) can require performance of physically, mentally, and intellectually demanding tasks with competence, efficiency, and levelheadedness amid pressure-packed and perilous situations. Citing the need to ensure its personnel are capable of meeting such demands, AFD has imposed rigorous processes for selecting and training prospective firefighters.

At all relevant times, the first step in becoming an AFD firefighter was to gain admission to the AFD Fire Academy. This entailed a competitive application process that included taking a written test, passing a physical skills test called the CPAT (Candidate Physical Ability Test), undergoing a psychological examination, and completing an interview before a review board or panel. From the pool of applicants who successfully completed this testing and interview process, the top-ranking official within AFD, known as the "Fire Chief," would select candidates for hire for admission to the Fire Academy. If selected, a new hire, known as a "fire cadet," would spend approximately six months at the academy receiving instruction and evaluation, through both academic and physical exercises, regarding numerous firefighting and medical tasks and skills. To graduate from the Fire Academy, a cadet was ordinarily required to achieve certification as a firefighter from the Texas Commission on Fire Protection, become certified as an emergency medical technician (EMT), and pass additional skills testing that AFD required beyond the minimum state standards.

Assuming that a fire cadet made it through the academy—and not all cadets did—there would follow a probationary period that, like the Fire Academy, was roughly six months

in duration. During this period, the "probationary firefighter" ("PFF") would obtain hands-on experience working in AFD "operations"—basically the division that responds to fire, rescue, and medical emergencies from fire stations located around the city, in the manner commonly associated with the job of a firefighter—and would be evaluated on his or her performance. When not busy on such "calls," PFFs were also required to undergo further training and evaluation on both written examinations and practical skills that overlapped or reinforced to some extent their prior Fire Academy instruction. This course of instruction and evaluation was structured into a succession of monthly "modules." At the conclusion of the modules, the PFF would undergo a final round of skills testing.

PFFs who successfully completed this process could then be hired as full-time, full-fledged AFD firefighters who enjoyed, among other benefits, the protections of civil service laws. While still PFFs or cadets, however, they remained at-will employees. The Fire Chief had the sole and ultimate authority to fire or retain a cadet or PFF. The Fire Chief who hired Booker—and, likewise, ultimately fired her—was Gary Warren, an AFD veteran of over thirty years who served roughly seven years as chief before resigning effective January 2005.

During Warren's tenure as Fire Chief, he endeavored to remedy a historical underrepresentation of women and racial minorities in the AFD ranks through means that included a recruiting initiative known as "Pass the Torch," a series of promotional and informational events that encouraged women and racial minorities to pursue careers as AFD firefighters. Warren personally attended many of these events and encouraged participants to apply for admission to the AFD Fire Academy. It was as a result of Warren's efforts to increase racial and gender diversity within AFD that appellant Booker came to seek employment there.

**AFD recruits Booker**

Booker, who is an African-American woman, was persuaded to attend one of Chief Warren's "Pass the Torch" events by an AFD recruiter who exercised at the same gym that she did. Although Booker's previous jobs had consisted of office work (she had been employed at Dell before getting laid off in 2001, then at a mortgage company, and thereafter at a homebuilder), she was encouraged by various AFD personnel to apply for employment—including, according to Booker, Chief Warren himself. She ultimately did so.

Booker passed the written test for admission to the Fire Academy as well as the CPAT, underwent the psychological evaluation, and went before an interview panel. Following her interview, the panel recommended to Chief Warren that Booker be hired for admission to the academy. As a final step in the hiring process, Warren ran a criminal background check on Booker. The background check revealed a criminal conviction that Booker had failed to disclose on her application despite being asked. While Warren indicated that such an omission would have ordinarily led him not to hire Booker, he investigated the matter further, determined that Booker had not been "intentionally dishonest" in failing to disclose her conviction,[1] and hired her anyway.

Warren was aware at the time he hired Booker that she was both African-American and female. By this point in AFD's history, there were a few dozen African-American firefighters in the department's ranks, as well as a few dozen women firefighters, numbers sufficiently large that each group had formed its own organization to provide support or fellowship for its members, the Austin African-American Firefighters Association (AAAFFA) and the Austin Women Firefighters

---

[1] In his affidavit, Warren explained that "after I made some inquiries, I learned that Booker had attempted to get the criminal conviction expunged and that it would have been expunged but for her failure to file a document."

(AWF), respectively. However, there had been scant few AFD firefighters who were both African-American and female. In fact, other than Booker, there was only one such firefighter then serving in the AFD, a veteran of over twenty-five years.

**Booker enters the Fire Academy**

Booker entered the AFD Fire Academy as part of Class 108, which began in March 2004. Class 108 was initially comprised of approximately twenty cadets, roughly split between a "blue" team and a "red" team, with Booker assigned to the latter. To summarize the events that followed, Booker's performance on both academic and physical skills exercises and evaluations caused her to be brought up for review at least three times by the Fire Academy's "Cadet Oversight Committee," a group comprised of the team leaders and officers in charge of the academy that would meet every two weeks to discuss the cadets' progress. This committee included a female firefighter who had been on the interview panel that had recommended Booker favorably for hire, Lisa Watts,[2] the "team leader" for Booker's red team.

On the first episode when Booker's performance was brought up for review, the Cadet Oversight Committee, including Watts, voted to retain Booker even while recommending the termination of another fire cadet who was Anglo and female. However, on its second review of Booker's performance, which occurred in late July 2004, the committee recommended to AFD higher management that Booker be terminated, citing "continuous difficulties with the academic portions of the academy," her failure to pass eight of 24 practical skills tests, and her inability to

---

[2] By the time of Booker's suit, Watts had married and changed her surname to "Watts-Madolora." Because she was known by Watts at the time of the underlying events, we refer to her by that name for clarity.

5

pass one of the skills tests—the "throw-bag" test, which evaluated a swift-water rescue skill—even on retesting. This recommendation was forwarded to a "Department Review Board" comprised of representatives of AFD upper management that included Chief Warren's chief of staff, Assistant Chief Jim Evans. Some members of the Department Review Board voted to terminate Booker, although Evans did not. After considering the views of the Department Review Board members and the written recommendation from the Cadet Oversight Committee, Chief Warren decided that Booker should be retained at the Fire Academy, given another chance to complete the throw-bag skill, and counseled about her performance.

Subsequently, in September 2004, as Class 108 was concluding its training at the Fire Academy, the Cadet Oversight Committee made a second recommendation—unanimously—that Booker be terminated. The written recommendation emphasized the committee's belief that "Cadet Booker is not competent to be placed at a fire station," and cited (1) Booker's failure to pass a third and fourth retest of the throw-bag test, despite having been given a "remediation plan . . . that allowed further practice time, both supervised by Swift Water instructors and Team Leaders and unsupervised by taking a throw bag home"; (2) Booker's failure of a second academic test despite having been "counseled several times for academic performance"; (3) Booker's failure of an AFD Final Performance Skill Test that consisted of six randomly selected skills on which Booker had been previously tested and had passed, which the committee found "noteworthy due to the fact that Cadet Booker, after approximately four months of fire training had significant difficulty with the essential function of connecting an engine to a hydrant"; and (4) Booker's failure to score above 70 in three of four emergency medical technician (EMT) written assessments. The committee further observed:

6

Cadet Booker appears to have difficulty retaining the information learned during the Academy. This is evident through the practical examples cited and academic performance on written tests. Team Leaders have spent many hours with Cadet Booker practicing multiple skills, as evidenced through the Team Leader notes, but this cadet had not been able to demonstrate retention of knowledge and skills nor the ability to competently perform job-related tasks required of a firefighter ready for Operations.

The Austin Fire Department Training Academy has a fixed amount of time to prepare an individual to become an Austin Firefighter. The requisite skills, knowledge, and abilities are substantial, but most that begin the academy are able to learn and develop into a competent, and capable Firefighter in the time allotted. The amount of additional assistance Cadet Booker has received from all areas has not been sufficient to produce the product we desire, a competent Austin Firefighter. Academy personnel have documented numerous performance counseling sessions, from the Team Leader up through the Program Manager. While her attitude and effort [are] good, there has been no corresponding positive increase in ability, application, or understanding. With skills, Cadet Booker has been described as able to 'mimic' someone else in order to pass, but when asked to apply the information by describing why something is done, change the testing situation, or incorporate multiple skills that a fireground demands, the cadet is often at a loss. The ability of Cadet Booker to simply pass a skill is often depend[e]nt upon many additional hours of practice, repetition, and instruction.

The Cadet Oversight Committee members have consulted numerous times with the Team Leaders and concur with the belief that Cadet Booker has had ample opportunity to change and improve, but has not, and is not ready for Operations and should not be released.

This time, the Department Review Board unanimously agreed with the committee's recommendation that Booker be terminated.

Chief Warren, however, rejected the unanimous recommendations that Booker be terminated. Instead, Warren decided to permit Booker to graduate the Fire Academy with the other remaining members of Class 108 and be assigned to Operations as a PFF. Warren later explained his reasoning in an affidavit he provided in support of the City's summary-judgment motion, "Although I believed that Booker should have been able to competently perform these skills [the

7

throw-bag skill and "the basic task of hooking a hose to a hydrant"] and pass her academic tests, I

believed at the time that she should be given an opportunity to graduate from the Academy and

succeed or fail as a PFF." He added, "I felt if Booker continued to train, she could learn those skills

and become a successful firefighter."

**Booker as a PFF**

Following graduation from the Fire Academy, newly minted PFFs were ordinarily

assigned randomly to a fire station that had staffing room to accommodate them, where they would

complete their probationary periods. However, the top cadet graduates were given the privilege

of choosing the fire station to which they would be assigned. In the case of Booker, however,

Chief Warren, in consultation with Assistant Chief Evans, departed from the normal practice

and assigned Booker to a station specifically selected for her—station 23, on the "A" shift.[3] In his

affidavit, Warren explained his reasoning as follows:

> In reaching my decision to retain Booker and allow her to graduate from the
> Academy, I also wanted to ensure that she had the best opportunity to succeed as
> a PFF. . . . I wanted Booker to go to a station where I knew she would receive
> excellent training and have the best chance to succeed. After discussing the options
> with Assistant Chief Evans, I concluded that Station 23, A shift, would be the
> best opportunity for Booker of the stations with openings for PFFs. I reached this
> decision because I believed that Lt. Bicknell, the officer at Station 23, would treat
> Booker fairly. Station 23 had another female fire fighter, Liz Forsyth Donelson
> who could help mentor Booker, and Captain [Chris] Watson, the Captain for the
> station, had a reputation in AFD for being an excellent trainer. Station 23 also had
> a moderate volume of calls with a good mix of fire and medical calls. This meant
> that Booker would have the opportunity to train and practice her skills in the field.
> I also knew that the Battalion Chief, Hank LaCaille, was an experienced and

---

[3] Evidently AFD operations were staffed by rotating shifts of firefighters working 24-hour periods on-duty, followed by 48 hours off-duty. The "A" designation signified the shift's place in the rotation.

professional firefighter who would give Booker the opportunity to succeed as a PFF. Finally, I considered the fact that Station 23 had an EMS unit in the same building. I believed that if Booker struggled with her medical skills, she would be able to work [with] EMS to improve those skills.

During the ensuing months, Chief Warren received "periodic updates" on Booker's performance from Assistant Chief Evans and from Randy Templeton, Booker's Division Chief. Meanwhile, Captain Watson, who assumed primary responsibility for Booker's training, generated extensive documentation reflecting persistent and severe performance deficiencies. Watson also videotaped some of Booker's training exercises. To summarize, Watson's accounts continued to echo themes that had appeared in the Cadet Oversight Committee's termination recommendations, including continued difficulty of Booker in performing and remembering how to perform various firefighter tasks, as well as errors in judgment (e.g., endangering a patient by improperly operating a stretcher, improperly using alcohol wipes when treating a patient with cuts). Warren also reported that Booker manifested signs of mental or emotional difficulties, including at least one episode at a station when she was heard exclaiming about her training exercises in her sleep.[4]

According to Chief Warren, "I learned that Booker continued to struggle with basic fire and medical skills," had received "unsatisfactory performance ratings at the conclusion of her first and second modules," and "did not exhibit signs of improving between her first and second module." In December, Warren was advised that LaCaille, Booker's Battalion Chief, had recommended her termination. After reviewing Booker's performance, Warren convened a Probationary Firefighter review board to consider the termination recommendation. The review

---

[4] Because firefighters assigned to Operations worked 24-hour shifts, it was not unusual for them to catch occasional sleep when not otherwise occupied.

board met on January 6, 2005, after which Warren received written recommendations from Assistant Chief Evans, Division Chief Templeton, and Battalion Chief LaCaille. Both Evans and LaCaille recommended termination. Although Templeton agreed that Booker had failed to master basic firefighting skills, he favored giving her further opportunity to improve and be reviewed again two weeks before the end of her probationary period.

Booker met with Chief Warren the next day, January 7, 2005. Booker agreed that she had exhibited performance problems but complained that Station 23 was not a "good fit" for her, that she received little support from her other team members, and that Captain Watson had seemed to want her to fail. After the meeting, Chief Warren informed Booker that he had decided to terminate her employment, effective immediately. According to Warren, he terminated Booker because "despite completing the Fire Academy and three months of the PFF program, she could not competently perform several basic fire and medical skills," "she had not met AFD standards in the PFF program," and "she had not exhibited sufficient signs of improvement over the course of her tenure in AFD." Warren concluded that "if Booker remained in the PFF program, she posed a potential safety risk to herself and others—including members of the public."

**Booker sues**

On May 11, 2005, Booker filed a charge of discrimination against AFD with the Civil Rights Division of the Texas Workforce Commission and the Equal Employment Opportunity Commission. *See* Tex. Lab. Code Ann. §§ 21.201-.202 (West 2006).[5] She asserted that she had

---

[5] In the absence of material intervening substantive changes, we will cite the current versions of statutes for convenience.

been discriminated against because of her race and gender, in violation of the TCHRA. *See id*. § 21.051(a) (West 2006). Booker amended her charge on November 22, 2005. In her amended charge, Booker added a new theory that she had been discriminated against as retaliation "for opposing and reporting discriminatory actions towards me." *See id*. § 21.055 (West 2006). On both her original and amended charge, Booker indicated, in the box marked "Date Discrimination Took Place," that both the earliest and latest date on which the complained of conduct took place was January 7, 2005, the date of her termination.

Subsequently, after Booker received a right-to-sue notice, *see id*. § 21.252 (West 2006), she timely filed suit against the City in district court, asserting claims that would be authorized under the TCHRA. *See id*. § 21.254 (West 2006); *see also Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 513 (Tex. 2012) (observing that the TCHRA effects a limited waiver of sovereign immunity as to the claims it authorizes); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012) (recognizing that TCHRA similarly waives governmental immunity). Booker alleged that the City had violated the TCHRA through race- and gender-based job discrimination, race- and gender-based "hostile work environment," and retaliation. *See* Tex. Lab. Code Ann. § 21.051(a), .055. The City moved for summary judgment dismissing all of Booker's claims, asserting both "traditional" and no-evidence grounds. The district court granted the City's motion in full without specifying the grounds on which it relied. This appeal followed.

## ANALYSIS

Booker brings seven issues on appeal challenging the grounds on which the district court could have relied in granting summary judgment. Her first three issues challenge the summary-judgment grounds addressed to her theories of race- and gender-based job discrimination,

11

her fourth and fifth issues challenge the grounds relating to her retaliation theory, and her sixth issue challenges the summary judgment as to her hostile-work-environment theory. In her seventh and final issue, Booker asserts that the district court erred in granting summary judgment as to claims predicated on discriminatory or retaliatory conduct other than her termination because, Booker insists, the City did not address those theories of liability in its motion.

In addition to responding to Booker's issues, the City brings a cross-point urging that Booker did not timely exhaust the administrative remedies that were prerequisites to her assertion of her retaliation claim. The City similarly argues that Booker exhausted her administrative remedies solely as to a charge of job discrimination in her ultimate termination, as opposed to any actions that preceded it. Because the City's contentions logically precede Booker's appellate issues, we will address them first.

**Exhaustion of remedies**

To bring a suit for unlawful employment practices under the TCHRA, a plaintiff must have first filed an administrative complaint "not later than the 180th day after the date the alleged unlawful employment practice occurred." *Id*. § 21.202(a). When filing suit, the plaintiff may raise only the specific issue made in the employee's administrative complaint and any kind of discrimination like or related to the charge's allegations. *University of Tex. v. Poindexter*, 306 S.W.3d 798, 807 (Tex. App.—Austin 2009, no pet.). As the Texas Supreme Court recently confirmed, compliance with the TCHRA's exhaustion-of-remedies requirement is a mandatory and jurisdictional prerequisite to the act's waiver of immunity. *See Chatha*, 381 S.W.3d at 510-14; *accord Poindexter*, 306 S.W.3d at 808-13 (reversing and dismissing, for want of subject-matter jurisdiction, TCHRA job-discrimination and retaliation suit against governmental entity for failure

12

to exhaust remedies); *see also Rusk State Hosp. v. Black*, 55 Tex. Sup. J. 1320, 1323-26, 2012 WL 3800218, at *4-6 (Tex. Aug. 31, 2012) (sovereign or governmental immunity is jurisdictional barrier to suit and thus may be raised for the first time on appeal).

Booker filed her initial charge of discrimination on May 11, 2005. In the section of the charge form titled "Cause of Discrimination Based on . . . ," Booker checked the boxed titled "race," "sex," and "other," specifying as to the latter, "Tchr Act." Booker did not check the box titled "Retaliation." In the narrative section of the charge form titled "Particulars," Booker stated that she was discharged on or about January 7, 2005 and that "I believe that I was discriminated against because of my Race (Black) and Sex (Female) in violation of the [TCHRA]." She elaborated that she "believe[d] that I was singled out and treated differently than three (3) White Male Firefighter[s]" in regard to the consequences of deficient performance and in being required to "perform monthly module testing on skill performances." In other words, Booker complained of disparate-treatment job discrimination based on race and gender. *See, e.g.*, *Poindexter*, 306 S.W.3d at 804 n.1. She gave no indication in her charge that she was complaining of retaliation. To the contrary, she conspicuously omitted such an allegation even where the form prompted her to provide it.

As Booker acknowledges, the timing of her initial charge of discrimination means that only unlawful employment practices by the City allegedly occurring on or after November 12, 2004—the 180th day before she filed her charge—could be actionable. *See* Tex. Lab. Code Ann. § 21.202(a). This outer window corresponds to a point in time after Booker had completed the Fire Academy and begun her PFF training, roughly around the time when she began receiving negative evaluations on her first module. However, in the box on the charge form titled "Date

13

Discrimination Took Place," Booker indicated that both the earliest and last date on which the complained-of discrimination occurred was January 7, 2005, the date of her termination. Likewise, she did not check the box indicating "Continuing Action."

In her subsequent amended charge, filed on November 23, 2005—long after the 180th day after she was terminated from AFD—Booker, for the first time, checked "Retaliation" under "Cause of Discrimination" and added narrative allegations regarding such a theory. She also revised her allegations concerning job discrimination to the effect that her ability to succeed as a firefighter had been impeded, compared to the three white male firefighters, by being "forced to change stations" more frequently, being given "multiple 'mentors' who would give conflicting instructions," being "held accountable for [her] performance" on monthly module tests "whereas, the white males were given all six months [of probation] to practice . . . before being held accountable," and in not being "given the benefit of constructive corrective action." However, as with her initial charge, Booker indicated that January 7, 2005—the date of her termination—was both the earliest and latest date on which the complained-of discrimination had occurred.

In its cross-point, the City argues that Booker failed to exhaust her administrative remedies with respect to her retaliation theory because she failed to raise it in her initial charge of discrimination and because the amended charge in which she finally raised it was untimely. Booker responds that her retaliation charge "relates back" to the date of her initial charge. Under the "relation back" doctrine, an "amendment to a complaint alleging additional facts that constitute unlawful employment practices relating to or arising from the subject matter of the original complaint relates back to the date the complaint was first received . . . ." *Id.* § 21.201(f); *Poindexter*, 306 S.W.3d at 809. But in *Poindexter*, as the City emphasizes, we held that an amended charge that

14

added a complaint of retaliation omitted from an initial charge that alleged only race-based job discrimination did not "relate back" to the original charge because retaliation is a different legal theory. *See Poindexter*, 306 S.W.3d at 809 (citing *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 878 (5th Cir. 2003); *Simms v. Oklahoma*, 165 F.3d 1321, 1327 (10th Cir. 1999); *Davis v. Education Serv. Ctr.*, 62 S.W.3d 890, 894 (Tex. App.—Texarkana 2001, no pet.)).[6] The facts here are materially identical to those in *Poindexter*—Booker filed a timely initial charge alleging only race- and gender-based disparate-treatment discrimination, then tried to add a retaliation theory through an amended charge filed beyond the 180-day deadline. As in *Poindexter*, the "relation back" doctrine cannot save Booker's untimely administrative charge of retaliation. *See id*. Consequently, Booker has failed to exhaust her administrative remedies with respect to her retaliation theory and that theory is, thus, jurisdictionally barred. Accordingly, we sustain the City's cross-point and overrule Booker's fourth and fifth issues, as well as her seventh issue as it pertains to her retaliation theory.

The City further asserts that Booker similarly failed to exhaust her administrative remedies as to any alleged adverse employment action other than those occurring on January 7, 2005—i.e., Booker's termination—the date Booker identified in both her initial and amended charge

---

[6] Because the TCHRA is intended in part to "execut[e] the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments," Tex. Lab. Code Ann. § 21.001(1) (West 2006); *see Cooper v. Wal-Mart Transp., LLC*, 662 F. Supp. 2d 757, 772 (S.D. Tex. 2009); *see also* 42 U.S.C.A. § 2000e-2(a)(1) (West 2012), and "to correlate state law with federal law in employment discrimination cases," *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam) (quoting *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003)), Texas courts consider federal law when construing and applying parallel provisions of the Act. *Id.*; *Canchola*, 121 S.W.3d at 739; *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000) (per curiam); *but cf. Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 507-09 (Tex. 2012) (recognizing that TCHRA does not track federal law in every respect).

15

as both the beginning and end date of the discrimination of which she was complaining. We agree. If Booker intended to complain of other actions or series of actions prior to that time, "then she was statutorily required to specify the date (and meet the separate 180-day filing deadline) of each discrete event." *Id.* at 808 (citing Tex. Lab. Code Ann. § 21.201(c)(2); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). She failed to do so in either her initial or amended charge. Consequently, Booker's claims predicated on alleged actions prior to her January 7, 2005 termination are jurisdictionally barred.

These holdings effectively narrow the range of Booker's appellate issues that remain live or viable solely to her first three issues, which challenge the district court's summary judgment on her theories of race- and gender-based job discrimination, and only to the extent these theories complain of disparate-treatment discrimination in her ultimate termination. We turn to those issues now, and overrule her other remaining issues.

**Job-discrimination theories**

### *Standard of review*

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Knott*, 128 S.W.3d at 215-16. When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubt in the non-movant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215.

The City's summary-judgment motion invoked both the "traditional" and no-evidence standards. Under the no-evidence summary-judgment standard, the movant may challenge whether there is evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. Tex. R. Civ. P. 166a(i); *see Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004). To overcome a no-evidence summary-judgment ground, the non-movant has the burden of presenting summary-judgment evidence raising a genuine issue of material fact on the challenged elements. Tex. R. Civ. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). A no-evidence summary judgment will be sustained when: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *King Ranch*, 118 S.W.3d at 751. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id*. (quoting *Kindred v. Con/Chem, Inc*., 650 S.W.2d 61, 63 (Tex. 1983)).

Under the traditional summary-judgment standard, in contrast, the movant has the initial burden of conclusively negating at least one essential element of a claim or defense on which the non-movant has the burden of proof or conclusively establishing each element of a claim or defense on which the movant had the burden of proof. *See* Tex. R. Civ. P. 166a(c); *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Once the movant has done so, and

17

only if it does, the burden shifts to the non-movant to produce evidence creating a genuine issue of material fact as to the challenged element or elements in order to defeat the summary judgment. *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

Where, as here, the trial court does not specify its basis for granting summary judgment, the judgment must be affirmed if any of the grounds asserted in the motion has merit. *See Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

### *Procedural framework*

As noted, Booker exhausted her administrative remedies only as to her theories of race- or gender-based disparate-treatment discrimination in her termination. To obtain relief for such "disparate-treatment" discrimination, proof and finding of a discriminatory motive is required. *See, e.g.*, *Poindexter*, 306 S.W.3d at 804 n.1 (quoting *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006) (citing *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977))). In the absence of direct evidence of discriminatory motive, Booker had the burden of establishing discriminatory motive circumstantially. To do so "[i]n discrimination cases that have not been fully tried on the merits," as here, "we apply the burden-shifting analysis established by the United States Supreme Court." *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) (per curiam); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). As this analysis is applied to the circumstances here, Booker had the initial burden to present a prima facie case of discrimination through evidence that: (1) she is a member of a class protected by the Act; (2) she was qualified for the position she held; (3) she suffered an "adverse employment action" (here, being terminated); and (4) she was treated less favorably that "similarly situated" persons outside

the protected class.[7] *See Auto Zone v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (per curiam) (citing *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam); *Reeves*, 530 U.S. at 142). If she succeeded, a legal presumption of unlawful discrimination arose. *See Mission Consol. Indep. Sch. Dist.*, 372 S.W.3d at 634. The concept underlying the prima facie case requirement is that evidence of the factual elements in themselves "raise[] an inference of discrimination . . . because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

If Booker met her prima facie burden, the burden shifted to the City to "articulate some legitimate, nondiscriminatory reason" for treating her differently than "similarly situated" persons outside the protected class. *See McDonnell Douglas*, 411 U.S. at 802; *Furnco*, 438 U.S. at 577-78. The "employer's burden is satisfied if he simply explains what he has done" or produces "evidence of legitimate nondiscriminatory reasons." *Board of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978) (internal quotations omitted). If the City articulated a legitimate, nondiscriminatory reason, the presumption of discrimination is rebutted, and the focus would shift to the ultimate issue of whether the City acted with impermissible discriminatory motives in treating Booker differently than "similarly situated" persons outside the protected class. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000) (per curiam). The ultimate burden

---

[7] Booker does not assert that she was replaced by a person outside her protected class; the consequence of her termination was simply that one fewer member of Class 108 was ultimately hired as a full-time AFD firefighter. *Compare Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 642 (Tex. 2012) (discussing prima facie case elements in suit alleging age discrimination in terminating and replacing employee) *with Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917 (suit alleging disparate treatment in termination for disciplinary reasons).

19

of proof on this issue remains with Booker, and she could overcome summary judgment in two ways. First, she could raise a fact issue as to whether the City's proffered reason for treating her differently was untrue and a mere pretext for discrimination. *See Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004). Alternatively, even if Booker could not raise a fact issue as to pretext, she could raise a fact issue that her protected characteristic was still "a motivating factor" for her disparate treatment. *See id*. In that event, the City could prevail on summary judgment by proving as a matter of law that it would have taken the adverse employment action against Booker even without any impermissible motive. *Id*.; *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989)).

### *Summary-judgment grounds*

The City asserted traditional summary-judgment grounds that, as a matter of law, it "did not take any adverse employment action against [Booker] because of her race or sex." The City also asserted that its summary-judgment evidence conclusively established that (1) it had a legitimate, non-discriminatory reason for terminating Booker—Chief Warren's conclusion that Booker's job performance had been unsatisfactory, that she had not shown signs of improvement, and that her inability to consistently perform even basic firefighting and medical skills posed a significant risk of harm to herself and others—(2) this reason was not pretextual, (3) it did not have a "mixed motive," and (4) it "would have terminated [Booker] regardless of any improper motive." The City asserted a no-evidence ground challenging whether Booker could present any evidence "to establish a prima facie case of race or gender discrimination," that the City's legitimate, non-discriminatory reason for terminating Booker was pretextual, or that Booker's race or gender were "motivating factors" in her termination.

20

In connection with the ultimate issues of pretext and motive, the City relied in part on the principle that where, as here, the same decisionmaker makes the decision both to hire and fire an employee who is a member of a protected class, "an inference arises that . . . discrimination is not the motive behind [the employee's] termination." *Brown v. C.S.C. Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996).

In Booker's first issue, she challenges the summary judgment to the extent it was based on her inability to raise a fact issue as to the prima facie case requirement. The City concedes that (1) Booker was a member of two protected classes (she is both African-American and female); (2) Booker was minimally qualified to be a PFF (inasmuch as Chief Warren had allowed her to graduate from the Fire Academy); and (3) Booker's termination was an actionable "adverse employment action." Booker also insists that additional "other discriminatory conduct" prior to her termination is either independently actionable or was not challenged as a potential basis for liability in the City's summary-judgment motion. This "other discriminatory conduct" consists primarily of alleged actions Booker attributes to Captain Watson or Assistant Chief Evans and represents an understandable attempt to shift our analytical focus away from the actions and motives of Chief Warren and the implications of the same-actor inference. Booker has not disputed that Chief Gary Warren was the ultimate decisionmaker in regard to her employment—including making the decision to terminate her—and that he also hired her with awareness that she was a woman and an African-American. Consequently, an inference arises that Warren did not act with a discriminatory motive in either hiring Booker or in any subsequent actions. *See id.*, 82 F.3d at 658. Booker has made no serious attempt to rebut this inference with respect to Warren's individual,

21

personal motives for his own conduct.[8]  Instead, she attempts on appeal to recast her suit as about Watson's and Evans's alleged actions leading up to her termination by Warren.  However, as we have explained, Booker did not exhaust her administrative remedies with respect to such pre-termination acts, and they are not actionable in any event.[9]

---

[8] If anything, Booker's proof further confirms Warren's non-discriminatory motives.  This evidence includes, e.g., an email from one of Booker's supporters in the women firefighter's group concerning criticism that he received following his decision to permit Booker to graduate the Fire Academy despite her performance deficiencies and enter AFD Operations.  She observed that Chief Warren "has done more for diversity and safety than any other chief we ever had and because of that his job is on the line.  His only mistake is being too nice!"  Nor does Booker dispute that Warren strove to increase diversity at AFD and repeatedly overrode his staff's recommendations to terminate Booker much earlier than she ultimately was.

[9] Booker complains of the following alleged conduct that she attributes primarily to Evans or Watson:

- she was non-randomly "assign[ed] to a station that would negatively [a]ffect her ability to learn the required skills and pass the tests";

- she was assigned to Captain Watson, who, according to Booker, "ha[d] a reputation for and history of discrimination against female firefighters";

- she was "[p]rovided conflicting instructions regarding required skills";

- she was "[n]ot provided the same assistance as a white male PFF";

- she was "harassed about her psychological/emotional fitness for the position by being made to feel unqualified/inadequate causing her nightmares";

- she was "held accountable for not passing modules even though there was no requirement that modules be passed before moving on to the next module";

- she was "[d]enied a transfer to another office and otherwise her complaint of discrimination and harassment were ignored";

- the department included "[f]alse negative write ups" in her probationary file in order to justify terminating her;

22

Consequently, to overcome the City's summary-judgment motion as to the prima facie case requirement for her job discrimination claim, Booker was required to raise a fact issue as to whether she was treated less favorably in regard to her termination than a "similarly situated" person outside her protected classes. In recent years, the Texas Supreme Court has strongly emphasized that "similarly situated" in the context of a job-discrimination claim based on disparate discipline entails "situations and conduct of the employees in question" that are "'nearly identical.'" *Auto Zone*, 272 S.W.3d at 593-94 (quoting *Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917-18). "Nearly identical" situations and conduct excludes "[e]mployees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records." *Id.* at 594 (citing *Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917). Similarly, "[t]he situations and conduct of employees is not nearly identical 'when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer.'" *Id.* (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)). Furthermore, the question of whether

---

- she was the first PFF "ever to be assigned to an EMS unit during probation and the only one ever to be so assigned for four shifts in a row."

However, "adverse employment actions" that are actionable in a job-discrimination claim "'include only ultimate employment decisions, such as hiring, granting leave, discharging, promoting, or compensating.'" *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (per curiam) (quoting *Green v. Administrators of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)). None of Booker's asserted "other discriminatory conduct" rise to this level.

Furthermore, contrary to Booker's arguments, the City's summary-judgment motion encompassed a challenge to whether Booker's "other discriminatory conduct" amounted to "adverse employment actions" that could be a basis for liability. The City's motion asserted that the evidence conclusively establishes that it did not take any "adverse employment action" against Booker (other than terminating her) and that she had no evidence to raise a prima facie case of race or gender discrimination. Thus, even leaving aside Booker's exhaustion-of-remedies problems, the district court properly granted summary judgment as to Booker's job-discrimination theories predicated on "other discriminatory conduct."

23

one or more employees are "similarly situated" should be considered "from the perspective of their employer at the time of the relevant employment decisions." *Perez v. Texas Dep't of Crim. Justice*, 395 F.3d 206, 210 (5th Cir. 2004).

Although Booker's administrative charge of discrimination identified three white PFFs as relevant "similarly situated" comparators to her, on appeal she suggests that it was enough that she was "similarly situated" to all other PFFs and that the other PFFs were not allowed to complete the entirety of their six-month probationary period and were not terminated. This is contrary to *Auto Zone* and *Ysleta*, which require much more. Nor does Booker seriously dispute on appeal that her performance issues, at least as conveyed to and viewed from Chief Warren's perspective, distinguished her quite negatively among her fellow PFFs and fire cadets and accounted for any differential treatment. *See Auto Zone*, 272 S.W.3d at 594. Booker essentially acknowledges as much, observing that "[i]f one were to review [Captain Watson's records of Booker's performance as a PFF] . . . Booker's performance would appear dismal and perhaps worthy of criticism."

Instead, Booker again attempts to shift the focus away from Chief Warren's actions and motives to those of Assistant Chief Evans and Captain Watson by urging that the evidence raises a fact issue as to whether Watson or others "fabricated" reports of her poor performance. Booker insists that the existence of these asserted fact issues regarding whether she performed poorly distinguishes her case from cases like *Auto Zone* and *Ysleta*, which, in Booker's view, involved undisputed allegations of employee misconduct, and render analysis under the "similarly situated" rubric inapplicable and inappropriate. In essence, Booker contends that the City's arguments concerning her poor performance must instead be analyzed under the rubric of pretext or mixed

24

motive.[10] In that regard, Booker argues in her second issue that she raised fact issues as to whether the City's proffered reasons for terminating her were pretextual and as to whether discrimination was a motivating factor in her termination. Relatedly, in her third issue, Booker asserts that the evidence raises a fact issue as to whether Warren's termination decision was influenced by the discriminatorily motivated actions of Evans, Watson, or others to the extent that their motives must be imputed to Warren's ultimate termination decision. *See Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) ("If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary co-workers, it is proper to impute their discriminatory attitudes to the formal decisionmaker."); *see also Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011).

Whether viewed under the rubric of whether Booker was "similarly situated" to other PFFs or the issue of whether her termination was a pretext for or otherwise motivated by discriminatory animus that can be charged to the City, we conclude that the evidence falls short of raising a fact issue that would preclude summary judgment on Booker's job-discrimination theories. Although Booker attempts to dispute some of the details of the performance deficiencies and lapses in judgment that Watson reported, Booker's poor-performance issues were acknowledged widely by others in AFD, including Lisa Watts, fellow female firefighters, and African-American firefighters who were among her supporters, and were deposed in this case—and even by Booker herself. During her deposition, Booker acknowledged that, despite extensive practice and retraining by AFD personnel, she had continued difficulties both at the Fire Academy and during her PFF

---

[10] Booker does not dispute that the City's summary-judgment proof that she was terminated for poor performance met its burden of articulating a legitimate nondiscriminatory reason for her termination, shifting the burden back to her to establish pretext or mixed motive.

25

training in attaching fire hoses to hydrants and fire trucks, and in recognizing and utilizing hand tools properly. She likewise acknowledged that she had endangered a patient by improperly operating a stretcher, had improperly used alcohol wipes when treating a patient with cuts, and had failed numerous academic and practical skills tests at both the Academy and in her PFF training. When confronted with her negative evaluations during her final review board meeting on January 6, 2005, Booker admitted conceding that "I have had my struggles."

To survive summary judgment, Booker was required to present some evidence that she did not perform poorly. *See Ajao v. Bed Bath & Beyond Inc.*, 265 F. App'x 258, 263 (5th Cir. 2008); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354-55 (5th Cir. 2005). Booker instead admits that she was not performing up to AFD's standards. Mere subjective beliefs that she had been a victim of discrimination are not sufficient to defeat summary judgment. *See Willrich*, 28 S.W.3d at 25; *Mire v. Texas Plumbing Supply Co.*, 286 F. App'x 138, 143-44 (5th Cir. 2008); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996). Nor is it enough to offer speculation as to whether AFD's motives in terminating her were solely her poor performance. *See Walton v. Bisco Indus.*, 119 F.3d 368, 370 (5th Cir. 1997).

Booker has not presented evidence sufficient to support a reasonable inference that she was "similarly situated" to other PFFs not of her protected classes in any respect relevant to her job-discrimination claims. *See Auto Zone*, 272 S.W.3d at 593-94 (quoting *Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917-18). Nor did she raise a fact issue as to pretext or discriminatory motive in terminating her, to the extent that we would reach that issue. *See Willrich*, 28 S.W.3d at 24-25. Thus, the district court properly granted summary judgment on Booker's claims for race-

26

or gender-based job discrimination. Accordingly, we overrule Booker's first issue as it relates to her termination, as well as her second and third issues.

**CONCLUSION**

Having overruled each of Booker's issues, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   March 13, 2013